UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHUE VUE,<br><br>    Plaintiff,<br><br>    v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>    Defendant. | No. 1:19-cv-01050-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

**I.      Introduction**

Plaintiff Chue Vue ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income (SSI) pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1] *See* Docs. 14, 17 and 18. Having reviewed the record as a whole the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 7 and 8.

1

**II.     Procedural Background**

On July 15, 2015, Plaintiff filed an application for supplemental security income alleging disability beginning October 12, 2007.[2]  AR 15.  The Commissioner denied the application initially on February 23, 2016, and following reconsideration on May 12, 2016.  AR 15.

On May 27, 2016, Plaintiff filed a request for a hearing.  AR 15.  Administrative Law Judge Shiva Bozarth presided over an administrative hearing held on March 20, 2018.  AR 30-57.  Plaintiff, who was represented by an attorney, appeared and testified through an interpreter.  AR 15.  On September 17, 2018, the ALJ denied Plaintiff's application.  AR 15-33.

The Appeals Council denied review on June 17, 2019.  AR 1-5.  On July 31, 2019, Plaintiff filed a complaint in this Court.  Doc. 1.

**III.    Factual Background**

    **A.  Plaintiff's Testimony**

Plaintiff (born June 1970) lived in an apartment with her seven children, some of whom were adults, and her grandchildren.[3]  AR 87.  Her daughter-in-law and son cooked for the family.  AR 87.

Plaintiff, who immigrated to the United States from Laos, had no education in the United States.  AR 81.  She spoke Hmong and could not read or write English.  AR 81.

Plaintiff most recently worked as a meat cutter at Harris Ranch Beef.  AR 79.  She also worked as a chicken eviscerator at Foster Farms.  AR 80-81, 82.

Plaintiff could not pick up heavy things with one hand and used her left hand to support heavy items that she lifted with her right hand.  AR 85.  She was able to hear when she wore her hearing aids.  AR 86.

Plaintiff experienced anger issues which she was addressing in therapy with Dr. Popper.  AR 89.  Another doctor prescribed her medications, Seroquel and Abilify.  AR 89.  Although her medications made her feel drowsy or unwell, she was "okay with it."  AR 89-90.

---

[2] On March 11, 2014, the Commissioner denied a previous application for disability benefits under Title II of the Social Security Act.  AR 15.  The ALJ determined that because the pending application was brought under Title XVI of the Act, *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988), did not apply,  AR 15.

[3] Plaintiff's testimony did not clearly establish how many children and grandchildren lived with her.  Some of the children lived with their father, from whom Plaintiff was divorced.  AR 87.

In October 2015, Plaintiff completed an adult function report with the assistance of her husband, Yee Chang. AR 290-98. Her ability to work was limited by mental depression, headache and other head pain, neck pain, bilateral shoulder pain, upper back pain, backbone pain, lower back pain, buttock pain, hearing loss, left arm pain, bilateral hand and finger pain, bilateral leg pain, and bilateral foot pain. AR 290. Her son and daughter cleaned house, cooked and cared for the family. AR 291.

Plaintiff needed accompaniment when she left home due to pain and hearing loss. AR 293. She shopped for food and clothing two to three hours weekly and attended church with her family on Sundays. AR 293, 294. Unable to discern how much American currency was worth, Plaintiff could not handle money. AR 293.

### B. **Medical Records**[4]

In October 2, 2013, Plaintiff, a seat-belted backseat passenger, was involved in a motor vehicle accident in Eureka, California. AR 549, 558. Peri Penman, D.O., examined Plaintiff in the St. Joseph Hospital emergency department after questionable cervical spine x-rays showed an odontoid abnormality. AR 602. Plaintiff complained of mild (4/10) neck pain and tingling of her left arm. AR 602. By October 4, 2013, Plaintiff reported that she felt better. AR 605. Dr. Penman discharged Plaintiff with a prescription for Hydrocodone with Acetaminophen. AR 605.

From October 2013 to June 2014, Yeng E. Xiong, D.C., provided chiropractic adjustments at varying intervals, sometimes multiple times weekly. AR 536-601, 610-23. In a pain questionnaire completed in December 2013, Plaintiff reported mild pain, infrequent and slight headaches, and slightly disturbed sleep. AR 563. She was experiencing some pain looking after herself and lifting heavy objects, but only slight pain or difficulty reading, concentrating, driving, doing her usual work and participating in most recreational activities. AR 563.

In January 2014, Dr. Tha Cha, a pain specialist, provided a consultation at Dr. Xiong's request. AR 559-60. Dr. Cha diagnosed a traumatic brain injury resulting in subjective memory loss with underlying cervico-lumbar sprain and strain with underlying spondolysosis. AR 560.

---

[4] This decision does not discuss documents in the administrative record that relate solely to Plaintiff's gynecological and obstetrical care. Plaintiff's youngest child was born in March 2015.

The doctor also found evidence of a left shoulder rotator cuff impingement. AR 560. Notably, when Dr. Cha examined and diagnosed Plaintiff, he had not yet reviewed imaging studies of Plaintiff's injuries. AR 560. He prescribed Baclofen for pain relief. AR 560. Plaintiff continued pain management services with Dr. Cha through June 2014. AR 779-97.

X-ray studies in May 2014 showed that except for a reversed lordotic curve, Plaintiff's cervical spine was normal. AR 551. Her lumbosacral spine was also normal. AR 552. X-rays of Plaintiff's left shoulder indicated a normal shoulder with a mild laterally down-sloping acromion process associated with an increased incidence of rotator cuff pathology. AR 553. In June 2014, Dr. Xiong noted that Plaintiff's neck and low back pain were intermittent and mild. AR 547. She saw Dr. Xiong once weekly and used her pain medication about once weekly. AR 547. Plaintiff described her pain as consistently 1/10. AR 547. Accordingly, Dr. Xiong discharged Plaintiff from care. AR 549.

From July 2014 through March 2016, Plaintiff received medication management and perinatal group therapy through Fresno County Behavioral Health (FCBH). AR 395-429, 662-78. Plaintiff frequently did not attend scheduled appointments and group therapy sessions. AR 403, 404, 405, 406, 410, 411, 412, 414, 415, 419, 420, 421, 422, 517-29. Plaintiff's diagnosis was schizoaffective disorder, depressive type. AR 395. She reported auditory hallucinations. Plaintiff began medication for her depression after her youngest child was born in March 2015. AR 398. Abilify helped alleviate her auditory hallucinations. AR 399.

In July 2015, psychiatrist Milica Stefanovic, M.D., described Plaintiff as passive and disengaged. AR 401. Plaintiff's husband intended to leave the family home shortly and Plaintiff did not know how she would support herself and her children. AR 401, 426.

When Plaintiff was discharged from the perinatal therapy group in March 2016, she reported a reduction of anxiety, depression and aggression, and no suicidal intent. AR 662. She recognized that she would continue to experience difficulty sleeping and conflict with her husband. AR 662.

From July 2014 to January 2018, Plaintiff received her primary medical care at Mountain Family Health Care Center (MFHCC). AR 430-52, 633-60. Plaintiff reported chronic pain and

tenderness of her knees and back.  X-rays in July 2015 revealed mild to moderate suprapatellar effusion of both knees.  AR 452.  Using an undated form, Pushpa Gursahani, M.D., recommended that Plaintiff be fitted with hearing aids.  AR 517-18.

Plaintiff's examinations at MFHCC were generally in the normal range until August 2015, when doctors provided follow-up diagnosis and treatment of thyroid problems identified by Plaintiff's psychiatrist.[5]  AR 430-31.  The physicians diagnosed goiter and identified a thyroid nodule.  AR 430-31.  Ultrasound and fine needle biopsy in October 2015 revealed scattered clusters of benign follicular cells.  AR 446-51, 488-89.  In July 2016, endocrine surgeon Christina Maser, M.D., conducted a follow-up examination to evaluate Plaintiff's thyroid nodules.  AR 625-34.  Dr. Maser diagnosed multinodular goiter and hypothyroidism and prescribed a small dose of thyroid hormone to correct the deficiency.  AR 625, 626.

From April 2016 through March 2018, Plaintiff received intermittent psychological treatment from Mark David Popper, Ph.D., and Mor X. Popper, M.S.W.  AR 801-14.  The treatment sessions occurred in three groupings: (1) April to July 2016 (3 sessions), (2) April to June 2017 (6 sessions), and (3) December 2017 to March 2018 (eight sessions).  AR 801-14.  Brief treatment notes included for each session document Plaintiff's feelings concerning anxiety, sadness, depression, hopelessness, worthlessness, blunted affect, marital problems and history of suicidal thoughts.  Plaintiff reported that both she and her husband experienced nightmares and flashbacks of war trauma.  AR 809.

Medical records in 2017 and 2018 noted that Plaintiff reported heartburn and back pain.  *See, e.g.,* AR 645, 647.  In June 2017, Plaintiff's wellness examination was reported to be normal.  AR 635.

**IV.     Standard of Review**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the

---

[5] Thyroid problems may first be apparent in a patient's depression, mood disturbance or other psychological symptoms.  *See* Thomas W. Heinrich and Garth Graham, M.D., Hypothyroidism Presenting as Psychosis: Myxedema Madness Revisited, Prim. Care Companion J. Clin. Psychiatry vol 5 at 200-06 (2003) reproduced at ncbi.nlm.nih.gov/PMC/articles/PMC419396/ (accessed September 18, 2020).

Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### V. The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§

///

6

416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI. Summary of the ALJ's Decision

The Administrative Law Judge found that Plaintiff had not engaged in substantial gainful activity since July 15, 2015, the application date. AR 17. Her severe impairments included major depressive disorder, recurrent, with psychotic features; schizoaffective disorder; and hearing loss, corrected with hearing aids. AR 17. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). AR 18.

The ALJ concluded that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels. AR 18. Plaintiff was limited to simple, routine tasks with occasional interaction with supervisors and the general public. AR 18-19.

Plaintiff was able to perform her past relevant work as a poultry eviscerator (DOT No. 525.687-074 (SVP 2, light work). AR 31. Accordingly, the ALJ found that Plaintiff was not disabled at any time from the application date of July 15, 2015, through September 17, 2018, the date of the decision. AR 32-33.

## VII. Assessment of Third-Party Lay Opinion

Plaintiff contends that the ALJ improperly analyzed and discounted the third-party adult function report completed by her brother, Mour Vue. Defendant disagrees, contending that the ALJ appropriately gave little weight to Mr. Vue's report since it was inconsistent with the medical evidence in the record as a whole and Plaintiff's care for her youngest child, who was

then an infant.

### A. Third-Party Adult Function Report

In October 2015, Mr. Vue completed a third-party adult function report that was substantially consistent with the adult function report submitted by Plaintiff. AR 299-306. Mr. Vue reported that Plaintiff had mental problems, depression, headache pain, hearing loss, back and leg pain, "low blood," high cholesterol, heart problems, ulcer pain, stomach pain, uterus pain, neck pain, bilateral leg T-bone pain, buttock pain with stooping or movement, sleep difficulty and hearing problems. AR 299, 306. Plaintiff's children provided household and personal care. AR 300.

Plaintiff left her home once a week "for sunshine" but needed to be accompanied at all times. AR 302. She shopped for food for more than an hour each week. AR 302. She did not understand the dollar's value. AR 302. Plaintiff did not drive because she could not hear. AR 302. Plaintiff had a short temper and did not get along well with others. AR 304.

### B. Analyzing Lay Opinion

"[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify to her condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). Disregarding lay evidence without comment violates the regulatory provision that the Commissioner will evaluate evidence from nonmedical sources. 20 C.F.R. §§ 404.1513(a)(4), 416.913(a)(4). However, "[a]n ALJ need only give germane reasons for discrediting the testimony of lay witnesses." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). Inconsistency with medical evidence is a germane reason. *Id.* An ALJ also provides germane reasons for rejecting testimony when the lay witness's testimony is substantively similar to other subjective testimony that has already been validly rejected. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009). For example, an ALJ appropriately discredited a lay opinion by explaining that it relied 'far too much" on Plaintiff's own allegations and was contradicted by the record as a whole. *Bennett v. Colvin*, 202 F.Supp.3d 1119, 1135 (N.D.Cal. 2016).

In this case, the ALJ wrote:

> I have considered the third party function report submitted by the claimant's [b]rother Mour Vue on October 14, 2015. Little weight is assigned to Mr. Vue's report as it is inconsistent with the medical evidence and the claimant's care of her infant born on March 6, 2015. Furthermore, it is inconsistent with Ms. Escoto's progress notes that indicate that the claimant was "feeling better overall" on September 24, 2014, and her discharge from mental health treatment on April 4, 2016.

AR 31 (citations to administrative record omitted).

The ALJ was not required to do more.

### VIII. Substantial Evidence Supported the Residual Functional Capacity Determination

Plaintiff contends that the ALJ erred in rejecting the opinions of her treating psychologist Dr. Popper and treating physician Dr. Garsahani. The Commissioner disagrees emphasizing the ALJ's analysis of the expert medical opinion as a whole. On review, the Court finds that the ALJ appropriately determined Plaintiff's residual functional capacity based on the evidence in the record as a whole.

#### A. Expert Medical Opinion

##### 1. Agency Physicians

On initial evaluation, psychiatrist G. Ikawa, M.D., noted that Plaintiff's depression was stable when she complied with medication. AR 105. Dr. Ikawa found Plaintiff's mental health claims to be "partially credible at best." AR 105. Her allegations of schizoaffective disorder and depression were not consistent with reports of her activities of daily living. AR 105. Medical records noted Plaintiff's improvement with medication, including better sleep, calmer and cooperative, less paranoid, planning for the future, and her ability to distract herself from her problems. AR 105. Plaintiff's therapy sessions were reported to be productive, and dealing with her marital problems had become more reality based. AR 105. Plaintiff demonstrated moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; and, moderate difficulties in maintaining concentration, persistence and pace. AR 106. She had

no repeated episodes of decompensation of extended duration.  AR 106.

With regard to Plaintiff's alleged physical impairments,  Roger Fast, M.D., noted an unremarkable consultative examination.  AR 105.  Recent medical problems were attributable to her recent pregnancy and delivery.  AR 105.  Plaintiff also had mild hearing loss.  AR 105.

On reconsideration, K. Mohan, M.D., agreed that Plaintiff's physical impairments were not severe.  AR 119.  J. Collado, M.D., agreed with Dr. Ikawa's assessment of Plaintiff's alleged mental health impairments.  AR 119-20.

### 2.     Consultative Examination: Internal Medicine (2016)

In February 2016, Lakshmanaraju Raju, M.D., conducted an internal medical evaluation of Plaintiff at the agency's request.  AR 506-11.  Plaintiff reported long standing pain including headaches and shoulder, back, knee and ankle pain, which she treated with ibuprofen.  AR 506.  She had chronic depressive neurosis attributable to her day-to-day stressors.  AR 506.  The physical examination was within normal limits in all respects.  AR 508-10.  Dr. Raju diagnosed chronic depressive neurosis, headaches and chronic polyarthritic pain of the neck, shoulders, back, knees, ankles, and wrists.  AR 510.

Dr. Raju opined that Plaintiff could sit, stand and walk up to six hours in an eight-hour workday and lift up to ten pounds both occasionally and frequently.  AR 511.  She was able to perform occasional climbing, balancing, stooping, kneeling and crouching as tolerated.  AR 511.  The doctor identified no manipulative, visual or communicative limitations.  AR 511.  Any environmental activities should be performed under supervision.  AR 511.  Although Plaintiff had arrived for the examination with a cane, Dr. Raju opined that the cane was not necessary.  AR 511.

### 3.     Consultative Examination: Internal Medicine (2018)

In July 2018, orthopedist Joseph B. Serra, M.D., performed a consultative examination at the agency's request  AR 822-32.  Dr. Serra reviewed many of Plaintiff's medical records including her 2014 x-rays.  AR 822.  He noted that following Plaintiff's most recent examination

at MFHCC in March 2018, Plaintiff reported that her pain was intermittent and mild indicating successful treatment with medication.  AR 822.  The doctor attributed Plaintiff's neck, back and shoulder pain to the aftereffects of two motor vehicle accidents, but noted that Plaintiff had no trouble walking and no history of falls.  AR 822.  He added that Plaintiff's description of her symptoms was vague.  AR 822.  Following a generally normal physical examination, Dr. Serra diagnosed low back pain with possible degenerative disc disease and a functional overlay attributable to the back pain.  AR 825.

Dr. Serra opined that Plaintiff had the capacity to stand and walk for six hours in an eight-hour workday, and to sit six hours in an eight-hour workday,  AR 825.  She could frequently climb steps and stairs, and could perform all other physical work activities continuously,  AR 825,  She had no environmental limitations.  AR 826.

### 4.     **Mental Medical Source Statement**

In June 2017, psychologist Mark D. Popper, Ph.D., completed a medical source statement.  AR 530-31.  Dr. Popper opined that Plaintiff's mental impairments precluded her interacting appropriately with the general public and maintaining socially appropriate behavior for ten percent of the workday in an unskilled job.  AR 530-31.  Plaintiff's mental impairments precluded all other mental abilities and attitudes for fifteen percent of the workday.  AR 530-31.  In the doctor's opinion Plaintiff was likely to be absent from work more than four days monthly.  AR 531.

In February 2018, Dr. Popper completed a residual functional capacity form on which he set forth the same ratings of Plaintiff's functional abilities as he had on the mental medical sources statement.  AR 679-81.  In response to a question asking whether Plaintiff had reduced intellectual functioning, which had not been presented on the prior form, Dr. Popper indicted that Plaintiff had a language barrier and was illiterate.  AR 681.  He opined that Plaintiff was able to manage her own benefit payments.  AR 681.

In March 2018, Dr. Popper completed a Mental Disorder Questionnaire Form.  AR 815-19.  His responses disregarded directions to indicate the dates associated with specific symptoms and occurrences; to include verbatim quotes of Plaintiff's own responses; to provide specific

supporting data and examples for to his opinions concerning Plaintiff's level of functioning; to discuss his responses in detail; and, to document standardized testing. ¶ 2 at AR 815; ¶¶ 5(A-D) and 6(A-D) at AR 817-18. Dr. Popper indicated that the form's request for past inpatient or outpatient mental health treatment was not applicable. ¶ 3 at AR 815.

In a lengthy discussion, Dr. Popper summarized Plaintiff's life experiences beginning with hardships Plaintiff and her family experienced during and immediately after the "Secret War" in their home country of Laos. AR 815-16. In 1987, Plaintiff fled to Thailand where she was detained in a refugee camp. AR 816. In 1992, Plaintiff emigrated to the United States as a refugee. AR 816.

Plaintiff's life in the United States was difficult. AR 816. She worked as an assembler before working at Foster Farms, which she left following a workplace injury. AR 816. One of Plaintiff's children is disabled. AR 816-17. Plaintiff had long-term marital problems culminating in her 2017 divorce. AR 817. Her difficulties included impecunity, limited English and illiteracy. AR 217.

Dr. Popper diagnosed major depressive disorder, recurrent episode, severe with psychotic features; post-traumatic stress disorder, chromic; generalized anxiety disorder; extreme poverty; inadequate housing; acculturation difficulty; and, educational problems (language barrier and illiteracy).AR 818. Plaintiff's medications included Piroxicam,[6] Vitamin D2, Baclofen,[7] Pantoprazole[8] and Olfloxacin.[9] AR 818. Dr. Popper did not indicate that Plaintiff was taking thyroid medication or any antidepressants or other psychotropic medications.

///

///

### 5. Physical Medical Source Statement

---

[6] Piroxicam is a nonsteroidal anti-inflammatory drug prescribed to treat osteoarthritis. Medlineplus.gov/druginfo/meds/a684045.html (accessed September 15, 2020).
[7] Baclofen is s skeletal muscle relaxant used to relieve pain and improve muscle movement. Medlineplus.gov/druginfo/meds/a682530.html (accessed September 15, 2020).
[8] Pantoprazole is a proton pump inhibitor used to treat symptoms of heartburn and GERD. Medlineplus.gov/druginfo/meds/a601246.html (accessed September 15, 2020).
[9] Ofloxacin is an antibiotic of the class fluoroquinolone used to treat bacterial infection. Medlineplus.gov/druginfo/meds/a691005.html (accessed September 15, 2020).

In December 2017, Dr. Garsahani completed a physical medical source statement. AR 532-35. Plaintiff reported symptoms of pain, dizziness, fatigue, sadness, anxiety and achiness, and was diagnosed with major depression, headache, neck pain, knee pain, lumbago, dyspareunia (painful sexual intercourse), a thyroid nodule and restless leg syndrome. AR 532.

Dr. Garsahani opined that Plaintiff could stand or walk for two hours at a time for a total of two hours in an eight-hour workday. AR 533. Plaintiff could sit for fifteen minutes at a time for a total of four hours in an eight-hour workday. AR 533. She needed to be able to sit, stand or walk at will. AR 533. Plaintiff would sometimes need to take unscheduled ten-to-fifteen minute breaks during the workday because of muscle weakness, chronic fatigue, pain, paresthesias, numbness and medication side effects. AR 533. With prolonged sitting Plaintiff's legs should be elevated at forty degrees for about half the time. AR 533. Plaintiff did not need to use a cane or other assistive device. AR 533.

In Dr. Garshani's opinion, Plaintiff could rarely lift up to ten pound and never lift twenty pounds or more. AR 534. She could rarely twist, stoop, crouch, and climb stairs, and could never climb ladders. AR 534. Although Dr. Garsahani reported that Plaintiff had no manipulative limitations, Dr. Garsahani also specified that Plaintiff could perform no manipulative or reaching activity more than 25 percent of the workday. AR 534. Plaintiff was likely to be off-task 25 percent or more of the workday and absent from work more than four days per month. AR 534. Plaintiff was unable to perform even low stress work. AR 534.

### B. **Determining Residual Functional Capacity**

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (residual functional capacity is not a medical opinion), 404.1546(c) (identifying the ALJ as

responsible for determining residual functional capacity). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews*, 53 F.3d at 1039-40.

"In determining a claimant's [residual functional capacity], an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)..

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).  The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a contradicted opinion of a treating professional, allegedly such as those of Drs. Popper and Garsahani in this case, may be rejected for "specific and legitimate" reasons. *Id.* at 830.   The opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

///

///

### C.  The ALJ Properly Analyzed Evidence in the Record as a Whole

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750.  An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record.  20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The ALJ's residual functional capacity analysis began with a detailed examination of Plaintiff's testimony and the representations in her written reports.  AR 19-20, 21-.  Plaintiff reported extensive pain and restriction of movement throughout her body, and alleged that she was unable to do anything.  AR 19-20.  Her children cared for Plaintiff's personal needs and did the housework and cooking.  AR 19-20.  However, Plaintiff also reported that she shopped for two to three hours weekly for food and clothing with assistance with driving and her inability to hear.  AR 20.  She attended church with her family.  AR 20.

After filing her appeal Plaintiff contended that her condition had worsened in multiple ways.  AR 21.  However, she continued to attend church and had attended the Hmong New Year celebration.  AR 22.  The ALJ concluded that the objective medical evidence in the record did not support Plaintiff's subjective allegations concerning the intensity, persistence and limiting effects that Plaintiff alleged. AR 22.  For example, the records of treatment following Plaintiff's 2013 accident indicated substantial reduction of pain and impairment as treatment progressed culminating in Plaintiff's discharge from chiropractic care and the pain clinic in 2014.  AR 23-24.  Also, after delivering her seventh child in March 2015, Plaintiff felt well and denied emotional concerns.  AR 24.

///

After considering Mour Vue's third-party function report (*see* AR 21 and § VII above),

the ALJ examined the objective medical evidence and the expert medical opinions in detail. AR 22-30. In the course of examining the records of Plaintiff;s treatment and consultative examinations, the judge highlighted numerous inconsistencies and concerns. For example, Plaintiff never told Dr. Raju[10] that she had given birth just months before, nor disclosed to Dr. Raju or Dr. Serra that she was caring for two young children. AR 24-25. The judge noted the nearly normal findings in the examinations performed by Drs. Serra and Raju and MFHCC Nurse Practitioner Neng Lee, and was perplexed by Dr. Raju's unexplained and very restrictive opinion of Plaintiff's functional abilities following an unremarkable examination. AR 24-25.

Considering treatment records of Plaintiff's mental health, the ALJ pointed out Dr. Stefanovic's opinion that Plaintiff's main psychological problem was her marital problems and the resulting fear of a lack of support after her husband left the family and Plaintiff's perceived inability to work. AR 26. Individual therapy with Marylou Escoto (FCBH) focused on Plaintiff's inability to bond with her new baby because of her anxiety.[11] AR 26. Ms. Escoto attributed Plaintiff's nightmares to this anxiety. AR 26

Although nothing in the record indicated any change in Plaintiff's condition following her discharge from treatment at FCBH in March 2016, she began treatment at Healing Hope, Inc., (Dr. Popper and social worker Mor Chang) in April 2016, claiming a significant decline in mental functioning. AR 27. In June 2016, Plaintiff reported suicidal thoughts then discontinued treatment at Healing Hope until April 2017. AR 27. Plaintiff again returned to Healing Hope In December 2017. AR 27. In February 2018, Dr. Popper prepared the mental residual functional capacity statement and in March 2018, he prepared the mental disorder questionnaire. AR 27-28.

---

[10] The ALJ inexplicably referred to Dr. Raju as Dr. "Lakshmanaraju." The doctor signed his consultative opinion as "Lakshmanaraju Raju, M.D." AR 511.

[11] Prenatal treatment records noted that the Plaintiff's unplanned pregnancy with their youngest child exacerbated her husband's discontent with their marriage.

Both opinions are summarized above.

The ALJ closed the discussion of the objective evidence and Plaintiff's testimony by observing:

> The claimant's statements about the intensity, persistence, and limiting effects of her symptoms . . . are unpersuasive because, with the exception of when she was participating in post-partum therapy and group therapy sessions, the claimant did not disclose to her healthcare providers or consultative examiners that she was caring for an infant and toddler. In her filing reports and function reports, she stated she was unable to do anything, and was cared for by others. However, she had a newborn and three-year-old toddler to care for. Furthermore there is no objective evidence to support her alleged back and shoulder pain after her chiropractic treatment following her 2013 automobile accident. Her shoulder x-rays on May 22, 2014, showed mildly laterally downsloping acromion process, in an otherwise normal left shoulder. Furthermore, the claimant did not seek intervention from an appropriate surgical specialist for her alleged shoulder pain or spine pain.

AR 29 (citations to administrative record omitted).

After summarizing the opinions of Dr. Garsahani and the agency physicians and psychologists (AR 29-30), the ALJ assigned very little weight to Dr. Popper's opinion:

> I have assigned no weight to the opinion[s] of Dr. Popper, as they are completely inconsistent with the claimant's conservative and sporadic treatment record, and report of Plaintiff's improvement. Furthermore, the progress note[s] from Dr. Popper's clinic do not indicate the claimant has risks associated with suicide, homicide, or even judgment, and show only diminished daily activities, while failing to address Plaintiff's care of her infant and toddler. Furthermore, the claimant failed to attend two consultative mental health examination[s] that had been requested by the agency.

AR 30 (citations to administrative record omitted).

The ALJ also gave very little weight to Dr. Serra's opinion, noting that the results of his examination of Plaintiff were consistent with the record as a whole, but did not support his opinion of Plaintiff's residual functional capacity. AR 30. Dr. Serra himself noted that Plaintiff's subjective complaints far outweighed any objective findings. AR 30.

///

///

Finally, the ALJ gave great weight to the opinions of the agency physicians and

psychologist, which were fully consistent with the medical and psychological record as a whole, including evidence submitted after the agency professionals had rendered their opinions.

The ALJ did not explicitly state that no weight was provided to Dr. Garsahani's opinion although that determination is implicit in the opinion. AR 29-30. The ALJ noted that although Dr. Garshani represented himself as Plaintiff's primary care physician, none of Plaintiff's medical notes from MFHCC included Dr. Garsahani's name or signature. AR 29. In addition, although Dr. Garsahani articulated substantial limits on Plaintiff ability to perform work (AR 29-30), with the exception of Plaintiff's goiter and low thyroid levels, treatment notes from MFHCC consistently reported normal physical examinations. Given this factual background the ALJ reasonably determined that Dr. Garsahani's opinion was not entitled to more weight based on the doctor's greater opportunity to know and observe the patient as an individual. *Lester*, 81 F.3d at 830; *Smolen*, 80 F.3d at 1285. And, in any event, Dr. Garsahani's opinion was contradicted by the medical evidence in the record as a whole.

The Court is not required to accept Plaintiff's characterization of her treatment records or her assessment of the medical opinions. Even if this Court were to accept that the record could support Plaintiff's opinion, the record also amply supports the ALJ's interpretation. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

### IX. Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Chue Vue.

IT IS SO ORDERED.

Dated:   **September 21, 2020**                    **/s/ Gary S. Austin**
                                                                         UNITED STATES MAGISTRATE JUDGE